## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CIC Partners,                                    Civil No. 09-3274 (SRN/SER)

                    Plaintiff,

                                                 <u>MEMORANDUM OPINION</u>
        v.                                       <u>AND ORDER</u>

Sunbeam Products, Inc., d/b/a
Jarden Consumer Solutions,

                    Defendant.
_____

Mark R. Bradford, Christopher R. Morris, Jessica Shulte Williams and Mark D. Covin, Bassford Remele, PA, 33 South Sixth Street, Suite 3800, Minneapolis, Minnesota 55402, for Plaintiff

George W. Soule and William N.G. Barron, Bowman & Brooke, LLP, Stephen T. Moffett and Thomas L. Vitu, Moffett, Vitu, Lascoe & Packus, PS, 255 East Brown Street, Suite 340, Birmingham, Michigan 48009, for Defendant
_____

SUSAN RICHARD NELSON, United States District Judge

        This matter is before the Court on Defendant's Motion to Exclude Expert Testimony and Opinions of Ronald C. Rahman [Doc. No. 23]; Defendant's Motion to Exclude Expert Testimony and Opinions of Paul W. Hansen [Doc. No. 27]; and Defendant's Motion for Summary Judgment [Doc. No. 33].   For the reasons set forth herein, Defendant's motions are denied in part, and granted in part.

## I.    FACTUAL BACKGROUND

        This action arises out of an apartment fire that occurred on June 14, 2007.  Plaintiff, CIC Partners ("CIC"), owned and operated a rental property located in Northfield, Minnesota. (Compl. ¶ 1.)  Irene and Leonard Horejsi rented a unit in the building where the fire at issue occurred.  (Horejsi Dep. at 6-24, Ex. 1 to Aff. of William N. Barron in Supp. Mot. Exclude

Rahman [Doc. No. 26-1].)  Approximately five years earlier, the Horejsis had purchased a Sunbeam heating pad.  Mrs. Horejsi testified that the heating pad was used in bed to warm her husband's feet because he had poor circulation.  (Id. at 17.)  Mrs. Horejsi taped the heating pad to the mattress pad so that it would stay in place.  (Id. at 56.)  An extension cord was attached to the heating pad, with a rug placed over the cord, between the bed and the electrical outlet.  (Id. at 19-20.)  Typically, Mrs. Horejsi turned the heating pad on and off for her husband's use.  (Id. at 79.)  On June 14, 2007, however, the heating pad was not turned on, nor had it been in use for a period of several weeks  before the fire.  (Id. at 83-84.)

At approximately 1:30 a.m. on June 14, 2007, Mr. Horejsi woke his wife, stating that he believed a blanket on the bed was on fire.  (Id. at 13.)  Mrs. Horejsi observed fire coming from the middle of the blanket, along the foot of the bed and extending down the side.  She rolled up the blanket and carried it outside.  (Id. at 13-14; 98-99.)  The Horejsis  and the other occupants of the rental complex safely evacuated the building, but the fire continued, causing significant property damage.  (Compl. ¶ 6.)

## A.    Ronald Rahman's Opinion

Ronald Rahman, Deputy Investigator with the Fire Marshal Division of the Minnesota Department of Public Safety, investigated the fire scene.  He is a Certified Fire Investigator, has taught fire investigation courses at community colleges and the Minnesota Bureau of Criminal Apprehension, and has investigated "hundreds, if not thousands" of fires.   (Rahman Dep. at 95-96 [Doc. No. 26-2].)  Rahman has worked for the State Fire Marshal during two periods: from 1985 to 1993, and from 1999 to the present.  In between these two periods, Rahman worked as a claims investigator for an insurance company.  (Id. at 6.)

On the day of the fire, Rahman received a page to go to the scene of the fire.   Rahman

examined the interior of the apartment building at the request of Northfield Assistant Fire Chief

Jeff Marchacek.  (Rahman Report at 3, Ex. 3 to Barron Aff. [Doc. No. 26-3].)  Rahman prepared

an initial report of his investigation of the fire, dated June 20, 2007, as well as a supplemental

report, dated August 8, 2007.[1]  (Id.; Rahman Dep. at 12, Ex. 2 to Barron Aff. [Doc. No. 26-2].)

In his report, Rahman indicates that upon his arrival at the fire scene, he observed heavy smoke

damage in the hallways, with heat damage apparent above the doorway to the Horejsi's unit.

(Rahman Report at 3, Ex. 3 to Barron Aff. [Doc. No. 26-3].)  He found the apartment complex

uninhabitable.  (Rahman Dep. at 36, Ex. 2 to Barron Aff. [Doc. No. 26-2].)   He describes the

Horejsi's bedroom as significantly fire damaged throughout, with the lowest area of fire damage

located at the foot of the bed and the front of the dresser directly in front of the bed.  (Rahman

Report at 4-5 [Doc. No. 26-3].)  In his report, Rahman also describes debris from the fire in this

area:

> During this process, small gauge stranded wires were noted in and under the fire
> debris.  The significantly melted remains of a small plastic oblong object were
> noted bonded to a piece of floor carpet close to the northwest corner of the
> dresser.  Utilizing a carpet knife, the edges of the object were cut loose of the
> carpet and the object was turned over.  The underside of the object was white in
> color and plastic.  It still retained the original shape and design on the protected
> side.  Further visual examination of this object revealed it to be a plug-in for
> either an electric blanket or a heating pad.

(Id. at 5.)

---

[1] Rahman's initial report of June 20, 2007, and his supplemental report of August 8,
2007, were submitted as a single exhibit, Ex. 3 to Barron Aff. [Doc. No. 26-3].)  The initial
report is at pages 1-10 of the exhibit, and the supplemental report is at pages 11-12.  Unless
otherwise noted, the Court cites to both documents collectively as the "Rahman Report."  In
addition to Mr. Rahman's initial and supplement reports, the parties deposed him on October 19,
2010.  (Rahman Dep., Ex. 2 to Barron Aff. [Doc. No. 26-2].)

In addition, Rahman examined the remains of the bed.  There, he also observed small gauge stranded electrical wires on the top of the fire remains at the foot of the bed.  (Id.) Rahman's report indicates that only the individual springs of the mattress were "predominantly totally annealed in the foot area of the bed, while the springs close to the head of the bed still retained their original shape and tensile strength."  (Id.)  Rahman examined the springs throughout the bed, but did not find any other small gauge stranded wires in any other location besides the foot of the bed.  (Id. at 5-6.)

Rahman ultimately concluded that "this case may be marked as accidental in cause, with the most probable ignition source being the Sunbeam heating pad that was located at the foot of the bed." (Rahman Dep. at 12 [Doc. No. 26-3].)  In his deposition, Rahman further noted that, in addition to the annealed mattress springs found only in the area near the foot of the bed, "the only edges of the floor joists that are damaged in that entire bedroom are above the bed, and most specifically, above the foot of the bed, above the area where this particular heat pad was." (Id. at 94.)

Rahman testified about how and why he ruled out certain other possible causes of the fire.  For example, he testified to his opinion that fire did not originate in the electrical outlet on the east wall of the bedroom:

> [U]sually, if an outlet would be an area of origin, the heat factor is going to be at the area of origin, which in this case, then, would have been the outlet.  That should have damaged the wall stud, which is wood, in this case, directly adjacent to it and where the outlet is fastened to. That didn't happen.

(Id. at 92.)   In addition, Rahman opined that the extension cord was not the likely cause of the fire.  (Id. at 87-88.)     When asked if he was aware of other fires caused by electrical appliances in the "off" position, Rahman testified that he has either investigated or known of other fires

caused by plugged-in electrical appliances in the "off" position.  (Id. at 97.)

### B.    Paul Hansen's Opinion

Plaintiff's insurer retained EFI Global to determine the cause and origin of the fire.  Paul

Hansen, an electrical engineer employed by EFI Global, provided an expert report and opinion in

this case.  (Hansen Report, Ex. 4 to Aff. of William N. Barron in Supp. Mot. Exclude Hansen.

[Doc. No. 30-4].)  Hansen considers himself to be an expert in electrical engineering,

particularly with respect to forensic work related to electrical engineering. (Hansen Dep. at 14,

Ex. 5 to Barron Aff. [Doc. No. 30-5].)  He possesses an electrical engineering degree and is a

member of the National Fire Protection Association ("NFPA").[2]  (Id. at 12.)

Hansen and Keith Tarbox, a fire investigator for EFI Global, participated in an on-site

investigation on July 31, 2007, along with investigators for Defendant Sunbeam.  (Id. at 35-37.)

In his report, Hansen describes his observations based on the July 31, 2007 visit.  (Hansen

Report at 3, Ex. 4 to Barron Aff. [Doc. No. 30-4].)  In addition, he describes an initial

nondestructive examination of the preserved evidence on September 24, 2007.  (Id. at 3-4.)

Based on this September examination, he concluded that no additional destruction on the

remains of the heating pad was necessary, as no further tests or examination could be done in

Hansen's laboratory on any arced or potentially arced wires.  (Id.)  All of the parties'

representatives again examined the evidence on November 8, 2007.

Hansen testified that, in order to reach his opinion, he conducted forensic examinations

of the fire scene debris, consulted photographs of the fire scene, spoke with Mr. Rahman about

his investigation and the eye witness accounts of the fire, and spoke with his colleague Keith

---

[2]  In addition to serving as a professional association, the NFPA promulgates codes and standards applicable to several fields, including fire investigation.

Tarbox about his investigation and the eye witness accounts.  (Hansen Dep. at 44-47, Ex. 5 to

Barron Aff. [Doc. No. 30-5].)  In his report, Hansen discusses the heating pad as the source of

the fire:

> Very little of the electric heating pad on the bed was recovered.  It can be identified as a Northern Electric/Sunbeam heating pad from the two recovered thermostats.  The controller for this device, which as electrical parts consisting basically of a three-position switch, was unrecognizable post-fire and was not recovered in any identifiable condition.  While its condition does not definitively demonstrate that its failure was the ignition source of the fire, its current state is certainly consistent with this hypothesis.  The other arcing noted in the nearby wiring in the bedroom is also consistent with the hypothesis that the electric heating pad, which was at the foot of the bed at the time of the fire, was the ignition source of the fire.  While it is possible to construct theories of how the arcing in the other wiring might have ignited this fire, such theories are not consistent with the eyewitness accounts of the fire nor are they consistent with the complete destruction of the controller/switch.
>
> The only theory consistent with the known facts of the case is a failure of the switch assembly in the heater controller resulting in the ignition of cloth materials at the foot of the bed.

(Hansen Report at 6, Ex. 4 to Barron Aff. [Doc. No. 30-4].)

In reaching "the inescapable conclusion . . . that the cause of this fire was the failure of

the Northern Electric/Sunbeam electric heating pad's switch assembly" (id. at 7), Hansen

eliminated other possible causes of the fire.  For example, he ruled out the Horejsi's electric

blanket as the cause of the fire because it was not plugged in at the time of the fire, was almost

intact, and the blanket's cord set was still in the room.  (Hansen Dep. at 66, Ex. 5 to Barron Aff.

[Doc. No. 30-5].)  In addition, he noted that the fire was observed to occur around Mr. Horejsi's

feet, in the area where the heating pad was located.  (Id. at 71.)  Hansen also testified about his

conclusion that the failure of the extension cord was not the possible cause of the fire.  He

eliminated the extension cord due to its location and because, as an electrical principle, the cord

would have carried voltage, as opposed to electrical load.  Given these circumstances, Hansen

testified that it would have been "very, very difficult to get a cord failure under these

conditions."  (Id. at 99.)

   **C.     Litigation**

   Plaintiffs filed suit in state court in October 2009, alleging negligence, strict liability and

breach of express and implied warranties.  (Compl. ¶¶ 7-20.)  Defendant removed the case to this

Court in November 2009.  (Notice of Removal [Doc. No. 1].)

   Defendant moves for summary judgment on all of Plaintiff's claims.  Defendant contends

that Plaintiff has failed to provide sufficient evidence of causation.  In particular, Sunbeam

argues that Plaintiff has not submitted admissible expert evidence showing that a defect in the

heating pad caused the fire.  Defendant seeks to exclude the opinions of Plaintiff's expert Paul

Hansen and Plaintiff's "unretained, undisclosed expert Ronald C. Rahman," on the grounds that

the experts failed to use reliable methodology in investigating the fire and in rendering their

opinions.  (Def.'s Mem. in Supp. Mot. Summ. J. at 1-2 [Doc. No. 35].)  Specifically, Defendant

argues that Plaintiff's experts did not adhere to the applicable professional guideline, NFPA 921:

Guide for Fire and Explosion Investigations.  As to Rahman, Sunbeam contends that not only

should his testimony be excluded for substantive reasons, but because Plaintiff failed to timely

disclose him as an expert, his testimony should be excluded on procedural grounds.

   Even if the Court does not exclude Plaintiff's expert opinions, Defendant argues Plaintiff

still cannot prove causation.  Sunbeam contends that Plaintiff's strict liability claim subsumes its

breach of warranty of merchantability claim, which, Defendant contends, fails because the

express warranty on the heating pad had expired at the time of the fire.  Finally, Defendant

argues that Plaintiff's failure to warn claim fails because Plaintiff has not provided any evidence showing that different or additional warnings would have prevented Plaintiff's damages.

In its response memorandum, Plaintiff argues that the opinions held by Rahman and Hansen are based on reliable methodologies and are admissible under the standards set forth in Daubert and Fed. R. Evid. 702.   In addition, Plaintiff avers that it will withdraw its warranty claims in Count III of the Complaint.   However, it argues that its claims for negligence and strict liability should  survive summary judgment, as Plaintiff has submitted eyewitness testimony and expert opinion as to the cause of the fire.  (Pl.'s Opp'n Mem. at 26 [Doc. No. 43].)  Moreover, Plaintiff contends that circumstantial evidence of product malfunction is a sufficient basis on which to submit a strict liability claim to a jury.  (Id.)

## III.   DISCUSSION

### A.   Expert Testimony

Opinion testimony from an expert "qualified . . . by knowledge, skill, experience, training or education" is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact" and if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  The Court, acting as a "gatekeeper," must evaluate whether proffered expert testimony passes muster under Rule 702, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597-98 (1993), bearing in mind that the touchstone for admitting such testimony is assistance to the trier of fact.  See, e.g., Larson v. Kempker, 414 F.3d 936, 941 (8th Cir.2005).  Courts may allow expert testimony only when it is both relevant and reliable, Daubert, 509 U.S. at 597-98, but "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," and "favors

admissibility over exclusion." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).

Accordingly, doubts regarding the usefulness of an expert's testimony should be resolved in

favor of admissibility, United States v. Finch, 630 F.3d 1057, 1062 (8th Cir. 2011), and "[g]aps

in an expert witness's qualifications or knowledge generally go to the weight of the witness's

testimony, not its admissibility." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (citing

29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6265

(1997)). "The exclusion of an expert's opinion is proper only if it is so fundamentally

unsupported that it can offer no assistance to the jury," Wood v. Minn. Mining & Mfg. Co., 112

F.3d 306, 309 (8th Cir. 1997) (internal quotations and citation omitted).

> In screening expert testimony under Rule 702, a district court applies a three-part test.

> First, evidence based on scientific, technical, or other specialized knowledge must
> be useful to the finder of fact in deciding the ultimate issue of fact. This is the
> basic rule of relevancy. Second, the proposed witness must be qualified to assist
> the finder of fact. Third, the proposed evidence must be reliable or trustworthy in
> an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the
> assistance the finder of fact requires.

Lauzon, 270 F.3d at 686 (internal citations and quotations omitted).

### 1.     Paul Hansen

Applying this test to Hansen's proffered expert opinion, the Court finds it sufficiently

reliable to be admitted under Rule 702 and Daubert. Courts analyze reliability from a flexible,

case-specific standpoint. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149-150 (1999).

Factors to be considered are whether the expert's theory or technique can be or has been tested,

whether it has been or is subject to peer review, and whether the theory or technique is generally

accepted within the relevant scientific community. Id. Defendant does not challenge Hansen's

qualifications, but rather, his methodology, arguing that Hansen's opinions and testimony are not

the product of any reliable methodology, and are not in conformity with NFPA 921.  In response,

Plaintiff argues that Hansen's methods are generally consistent with NFPA 921, are reliable and,

in any event, the NFPA methodology is not the exclusive methodology available.

Defendant's fire investigator Ron Hall contends that the 2004 edition of NFPA 921, in

effect at the time of the fire at issue, provides a working framework by which effective fire

investigations and cause and origin analyses may be accomplished.  (Hall Aff. ¶¶ 2-3, Ex. 6 to

Barron Aff. [Doc. No. 30-6].)   Hall attests that, among the procedures set forth in NFPA 921,

fire scene investigators are advised to utilize fire scene reconstruction, perform adequate debris

removal, interview owners and occupants about the fire, locate all sources of potential ignition,

and eliminate other possible sources through developing, testing and rejecting of alternative

hypotheses.  (Id. at ¶¶ 4-16.)   Sunbeam's expert further contends that an investigator should use

the scientific method as the method for data gathering, hypotheses development and hypotheses

testing.  (Id. at ¶ 15.)

From the description of Hansen's testing methodology, the Court is satisfied that, for

purposes of the Daubert standard, Hansen reached his conclusions using a generally-accepted

methodology.  As stated in his report, his examination of the fire scene "proceeded along the

general guidelines as outlined in NFPA 921 and other guidelines typically used in the fire

investigation profession."  (Hansen Report at 2, Ex 4 to Barron Aff. [Doc. No. 30-4].)

Consistent with NFPA 921, Hansen reviewed the available evidence, obtained information

regarding eyewitness accounts, inspected and photographed the fire scene, evaluated the

electrical arcing and eliminated certain causes of the fire.  While Hansen may not have

performed every method of fire scene investigation set forth in NFPA 921, he appears to have

utilized many of the techniques set forth in the guideline.  As recognized by this Court in

10

American Family Mut. Ins. Co., v. Hewlett-Packard Co., 07-CV-792 (ADM/AJB), 2008 WL

2130217, *6 (D. Minn. May 19, 2008), "although compliance with NFPA 921 may be an

important credential for expert testimony, it does not have talismanic significance."  In American

Family, this Court rejected the defendant's argument that the plaintiff's expert's lack of

adherence to NFPA 921 methodology rendered the expert's investigation unreliable.  Id. at *4-6.

The plaintiff's experts had made clear that they identified five possible sources of ignition and

then used the scientific method to determine which was the most probable source.  Id. at *6.

In this case, Hansen testified as to the possible causes of the fire and why he determined

that the heating pad was the cause.  As Hansen explained, a heating pad, plugged in, in the "off"

position, can start a fire:

> It's a switch failure, regardless of when the last time the switch was operated.
> Switch failures occur for - well what causes a fire is you have a conducted path of
> resistance which causes resistance heating, igniting the nearby combustibles.
> [The] [f]irst fuel would be the switch housing, which may or may not have been
> flame- retardant.  As long as you're applying heat, it will burn, and then the
> source of the fuel after that would be the bedding material.  The blanket seems to
> be in close proximity, and the fitted sheet would also qualify as an early fuel.

(Hansen Dep. at 92, Ex. 5 to Barron Aff. [Doc. No. 30-5].)  Hansen further testified that the

heating pad switch was the only ignition source that could not be eliminated as the cause of the

fire.  (Id.)

Defendant is particularly critical of Hansen's elimination of the extension cord as a

possible cause of the fire.  However, Hansen explained that he ruled out the extension cord not

only due to its location, but because, in his experience, it would be very difficult to generate heat

in a cord that carries voltage, but not load.  While Defendant argues that Hansen was confused

about the location of the extension cord, the evidence also demonstrates that Hansen's judgment

was not based only on the location of the cord.  Hansen noted that the fire was observed to occur

11

around Mr. Horejsi's feet, in the area where the heating pad was located.  (Id. at 71.)  In addition,

Hansen testified that the extension cord was not the likely cause of the fire because it would have

carried voltage, as opposed to electrical load, and would not have been likely to fail.  (Id. at 99.)

Hansen has sufficiently explained his methodology and, while Defendant disagrees with

his opinion, this difference of opinion may be explored through fulsome cross-examination and

the presentation of rebuttal expert opinion.  This Court reached the same conclusion in Quist v.

Sunbeam Prods., Inc., 08-CV-5261 (DWF/AJB), 2010 WL 1665254, * 7-8 (D. Minn. Apr. 22,

2010), in which Sunbeam similarly moved to exclude the testimony of two experts in a case

involving a Sunbeam heating pad that was alleged to have caused a fatal fire.   Likewise,

Sunbeam's disagreement here with Hansen's methodology and conclusions is not grounds for

the exclusion of his opinion.

Defendant further argues that Hansen failed to test this theory on an exemplar, but, as

Plaintiff contends, it would be difficult to test this theory, as it would apparently require

plugging in a Sunbeam heating pad, turning it to the "off" position, and waiting for an unknown

period of months, for a fire to occur.  Finally, while Defendant contends that Hansen failed to

interview Mrs. Horejsi and did not review her deposition transcript, this does not merit the

exclusion of his testimony.[3]  Hansen reviewed Rahman's report and spoke to both Rahman and

Keith Tarbox about the eyewitness accounts.  Mrs. Horejsi was clear in her testimony that she

saw the fire only in the area of the bed near the heating pad and nowhere else in the room.

(Horejsi Dep. at 14, Ex. 1 to Barron Aff. [Doc. No. 26-1].)  For all of these reasons, Hansen is

---

[3] The Court notes that as to the witnesses to the fire, only Mrs. Horejsi was deposed because Mr. Horejsi passed away in November 2010.  (Horejsi Dep. at 41, Ex. 1 to Barron Aff. [Doc. No. 30-1].)

qualified to offer his opinion and, subject to proper foundation, his proffered testimony sufficiently satisfies the reliability requirements of <u>Daubert</u>.

As to the relevance of Mr. Hansen's proffered testimony, the Court finds that his proffered opinion is highly relevant.  Defendant offers no substantive argument to the contrary, other than its arguments against Hansen's methodology.   Further, even Sunbeam's electrical engineering expert apparently does not rule out the heating pad as a possible source of the fire. Richard Blanchard, Defendant's expert, identifies three possible sources for the fire: the extension cord, the outlet at the head of the bed, and the heating pad control.  (Blanchard Rep. at 25, Ex. 1 to Decl. of Richard Blanchard [Doc. No. 41-1].)  While Blanchard believes that the fire scene evidence does not indicate that the heating pad control caused the fire, he does not rule it out entirely.  (<u>Id</u>.)  Opinion evidence as to the cause of the fire is the central issue in this case. Such testimony is therefore relevant and will assist the trier of fact.  Defendant's motion to exclude the testimony and opinion of Mr. Hansen is denied.

### 2.    Ronald Rahman

As noted, Defendant argues that the opinion and testimony of Ronald Rahman should be excluded on procedural grounds due to Plaintiff's untimely expert disclosure.   Discovery in this case was to have been completed by April 1, 2011. (Order of 1/25/11 [Doc. No. 20])   At the hearing on Defendant's instant motions, counsel for Plaintiff represented that Plaintiff disclosed Rahman as an expert on May 4, 2011.  (Tr. of 8/12/11 hearing [Doc. No. 48].)   However, Defendant apparently had prior notice of Plaintiff's intent to use Rahman as an expert witness, albeit not formal notice, as the instant motion to exclude his expert testimony was filed on April 15, 2011.  The parties had deposed Rahman several months earlier, on October 19, 2010.   (Ex. 2 to Barron Aff. [Doc. No. 26-3].)

In <u>Tomlin v. Holecek</u>, 158 F.R.D. 132, 136 (D. Minn. 1994), this Court considered factors set forth by the Eighth Circuit in determining whether to exclude the testimony of a witness not disclosed in compliance with a pretrial order.  The factors include: (1) the reason the party fails to name the witness; (2) the importance of the testimony; (3) the amount of time the opposing party needs to properly prepare for the testimony; and (4) whether a continuance would in some way be useful.  <u>Id.</u>  Plaintiff offers no explanation for its failure to disclose Rahman as an expert in accordance with Fed. R. Civ. P. 26 and this Court's orders.  However, there is no evidence that the delay and non-disclosure were tactical ploys.  Rather, the failure appears to have involved "oversight, neglect or inadvertence."  <u>Id.</u>  "In and of itself, such an explanation for untimely expert disclosures is insufficient to warrant an exclusion of the testimony of those experts who were so belatedly disclosed."  <u>Id.</u>

Turning to the second element of the analysis, there is no question that the testimony of Rahman is critical to Plaintiff's case.  Although he was not initially retained to given an opinion as to the cause of the fire, in the course of his investigation on behalf of the State Fire Marshal, he reached conclusions about the fire and its cause.   His testimony therefore implicates Defendant's liability.   Given Rahman's role in investigating the fire on behalf of the State Fire Marshal, at the very least, the parties considered him to be a fact witness from the outset of the case.  Rahman was consequently deposed.   Although his deposition occurred prior to Plaintiff's disclosure of Rahman as an expert, Defendant had the opportunity to question his conclusions and methodology.  On balance, the Court finds that the importance of Rahman's testimony outweighs any harm to Defendant.  As to the factors involving the amount of time that the other side requires in order to properly prepare and any need for a continuance or delay, Plaintiff's disclosure of Rahman, while late, came well in advance of trial.   Defendant will have a full

opportunity to cross-examine Rahman at trial.   The Court will not exclude his testimony on the grounds of Plaintiff's late expert disclosure.

As to the merits of Sunbeam's motion to exclude Rahman's testimony, as with Hansen's testimony, Defendant argues that Rahman's opinion and testimony should be excluded for its failure to strictly adhere to NFPA 921.  Sunbeam argues that Rahman's conclusion was not reached through application of the appropriate methodology.   Plaintiff rebuts Sunbeam's position, arguing that Rahman followed proper methodology in conducting an investigation of the fire scene and that his opinion is reliable and helpful to the trier of fact.

The Court finds that Rahman's testimony is reliable and admissible, subject to proper foundation being laid.  Sunbeam's challenges to Rahman's testimony go to his credibility, not admissibility.  As to Rahman's methodology in investigating the fire, Rahman testified that, when investigating fires, he tries to follow the NFPA guidelines, using the scientific method. (Rahman Dep. at 8; 80, Ex. 2 to Barron Aff. [Doc. No. 26-2].)  Rahman arrived at the fire scene on the day of the fire and conducted a visual inspection of the exterior and interior of the apartment building.  He spoke with witnesses and wrote a preliminary report.  He also examined the physical evidence from the fire and took photographs of the fire scene.   There is nothing about his approach that demonstrates unreliability or some unusual, or innovative departure from techniques used by fire investigators.  That Rahman does not describe each step of his methodology in lock-step with the NFPA 921 guidelines is not fatal to the admissibility of his testimony.

This Court, and others, have reached the same conclusion.  As noted, in American Family, this Court found that a failure to strictly adhere to NFPA 921 does not render a fire investigation unreliable, nor is NFPA 921 the exclusive standard for such investigations.

American Family, 2008 WL 2130217 at *4.   Similarly, in a state court case from Connecticut,

Jordan v. Yankee Gas Services Co., No. X01CV940185567S, 2006 WL 280478, * 4 (Conn.

Super. Ct. Jan. 18, 2006), the defendant gas company moved to preclude the testimony of two

fire investigators with the Connecticut State Fire Marshal's Office, whom the plaintiff had

disclosed as experts.   The court rejected the defendant's argument and found the witnesses

qualified to testify, even if they did not precisely follow NFPA 921:

> While the NFPA 921 sets out a method of fire origin and cause investigation
> endorsed not only by [the experts at issue] but by professional organizations as
> valid, reliable, and authoritative and while it is a comprehensive guide, its
> contribution to fire science ought not be over-stated. It may now be the preferred
> fire investigative method, but it was never intended to invalidate or supplant all
> other valid scientific methods. To suggest—as Yankee Gas does—that all origin
> and cause experts must follow the five (5) steps (described in Chapter 4 [of NFPA
> 921]) comprising the basic methodology of a fire investigation in a ritualistic
> lock-step approach ignores not only other authoritative sources (i.e., Kirk's Fire
> Investigation, the Fire Investigation Handbook, the Fire Protection Handbook,
> etc.) but also ignores the testimony of both investigators that they employed the
> same methodology but did not then identify it as "the scientific method."  It is a
> jury question whether their investigation was based on valid and reliable methods
> of origin and cause fire investigation.

Id. at *6.

Defendant also apparently takes issue with Rahman's lack of testing of possible

hypotheses for the fire.  Rahman testified that he concluded that the heating pad was the cause of

the fire through the process of elimination:

> Q: Ever look in or make any determination how a heating pad such as this, that
> had not been turned on or used for about two months before the fire, could
> generate enough heat to cause a fire?
>
> A:  By looking at the damages to the room and down to that area of the bed where
> fire was stated to be first and then doing the elimination process of what is there.
> The only other item that was there, besides the mattress, the electric blanket, was
> the heating pad.  The electric blanket was not plugged in.  Therefore, it could not
> be considered as an ignition source because it had no potential power to it.  The
> only other item there, going back again, is the heating pad.  The area where the

16

heating pad was, the springs are annealed, which is the losing of tensile strength and flattening out of the springs.

(Id. at 83-84.)  In his deposition, Rahman acknowledged that as a State Fire Investigator, he is charged with determining whether a fire is accidental or criminal and what may have caused the fire.  (Id. at 85.)  He testified that as to this fire scene, he also was present when electrical engineers, including the parties' experts, were processing the scene.  (Id. at 86.)  He also conceded that he performed no scientific testing to determine whether the heating pad was the source of the fire, but also stated, "[h]owever, hypotheses can also be used as scenarios or potential scenarios and not just scientific testing."  (Id. at 85.)

Rahman relies on his experience and training as a fire investigator, his personal examination of the fire scene and electrical evidence, and interviews with witnesses.  He has investigated hundreds of fire scenes.  He is familiar with NFPA 921, and also relies on the scientific method in conducting fire scene investigations.  His testimony is both relevant to the central issue of the case and helpful to the trier of fact.  To the extent that Sunbeam disagrees with Rahman's methodology and conclusions, Sunbeam may challenge Rahman's credibility at trial, rebut his testimony with Sunbeam's own witnesses and submit its own contrary evidence.  Defendant's Daubert motion as to Rahman, however, is denied.

**B.     Summary Judgment**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Whisenhunt v. S.W. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn

from it, in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Davenport v. Univ. of Ark. Bd. of Trustees, 553 F.3d 1110, 1113 (8th Cir.2009) (citing Anderson, 477 U.S. at 247–49).

### 1. Warranty Claims

Plaintiff avers that it will withdraw its claims alleging breach of express and implied warranties.  The Court therefore grants Defendant's Motion for Summary Judgment in part, as it relates to the warranty claims.

### 2. Negligence and Strict Liability

Sunbeam argues that Plaintiff's remaining claims for negligence and strict liability should be dismissed on summary judgment because Plaintiff cannot show that a design defect was the proximate cause of the injury.  In addition, Sunbeam argues that Plaintiff's failure to warn strict liability claim also fails.

### a. Defect

As to causation in general, to the extent that Defendant's motion for summary judgment is premised upon the exclusion of Plaintiff's expert testimony, it is denied.  Regarding the issue of defect, a design defect is a proximate cause of injury when the injury follows in unbroken sequence from the defect without an intervening cause.  Thompson v. Manitex, 04-CV-3046 (JRT/FLN), 2006 WL 748280, *2 (D. Minn. Mar. 22, 2006) (citations omitted).  Sunbeam argues that summary judgment is appropriate because Plaintiff cannot show that the design of

the heating pad's switch assembly was the cause of injury.  Plaintiff argues that circumstantial

evidence of defect may be admissible to prove defect, citing Holkestad v. Coca-Cola Bottling

Co., 180 N.W.2d 860, 865 (Minn. 1970), and Lindsay v. McDonnell Douglas Aircraft Corp., 460

F.2d 631 (8th Cir. 1972).

It is true that circumstantial evidence may be admitted to prove defect, but, as Defendant

contends, this type of proof typically arises in res ipsa loquitur cases.  For example, Holkestad, a

"classic" res ipsa loquitur case, involved an exploding bottle of Coca Cola that injured the

plaintiff, and for which there was no other explanation but that the bottle was defective. 180

N.W.2d at 864.  Lindsay involved a new navy jet that crashed into the ocean with only four

hours of total flight time.   Here, however, whether the heating pad caused the fire is not a res

ipsa situation, but is, instead, an issue of strongly disputed fact.  Defendant has submitted expert

testimony that rebuts Plaintiff's theories.

Plaintiff's experts opine that the fire was proximately caused by the heating pad.

Electrical engineering expert Hansen specifically contends that the cause of the fire was the

failure of the heating pad's switch assembly.  (Hansen Report at 7 [Doc. No. 30-4].)  In his

deposition, Hansen testified that the heating pad's switch failure led to resistance heating which,

in turn, ignited nearby combustibles.  (Hansen Dep. at 94, Ex. 5 to Barron Aff. [Doc. No. 30-5].)

While Hansen may not use the word "defect," implicit in his conclusion is that the heating pad

switch was defective and proximately caused the fire.

Defendant argues that the facts of this case are very similar to those of  Fireman's Fund

Ins. Co. v. Canon, U.S.A., Inc., 394 F.3d 1054 (8th Cir. 2005).  In that products liability action

against a manufacturer of a copier that allegedly caused a fire, this Court excluded the plaintiff's

expert opinions as unreliable.  The Court found that the experts' proffered opinions did not

19

follow the provision of NFPA 921 that requires an investigator to compare their hypothesis to all known facts by reconciling the empirical evidence with their theory. This was particularly true as the experts had reversed their opinions on the meaning of the burn pattern evidence - an about-face which "seriously undermine[d] the reliability of the experts' opinions." Id. at 1059. On appeal, the Eighth Circuit affirmed, finding that the Court did not abuse its discretion in excluding the opinions. Id. at 1058. Absent the excluded opinions of the fire causation experts, the Eighth Circuit agreed that the plaintiff presented no evidence of any defect in the copier. Id. at 1060-61. Even if the opinions had been admissible, the Eighth Circuit found that the plaintiff failed to present evidence from which a jury could determine that a defect in the copier was the proximate cause of the fire. The experts theorized that a thermal fuse was defective, but their experimental tests did not demonstrate that the heating element could generate an open flame before the thermal fuse was opened. Id. at 1061. In addition, the experts advanced no theory showing how the heater control circuitry could malfunction to produce an electrical current to start a fire. Id.

The Court finds that Fireman's Fund involved facts distinct from those here. The experts, whose opinions were excluded, had changed their opinions, failed to articulate a defect and their opinions did not mesh with the empirical evidence. The Court finds that Plaintiff's expert Hansen has advanced a sufficient theory of proximate causation and his opinion is not inconsistent with the empirical evidence. Defendant's motion for summary judgment on this ground is denied.

### b.    Failure to Warn

"A cause of action for failure to warn is separate from one for an allegedly defective product design." Thompson, 2006 WL 748280 at *4 (citing Holowaty v. McDonald's Corp., 10

F. Supp.2d 1078, 1085 (D. Minn. 1998)).   It appears that Plaintiff alleges a failure to warn only in its strict liability claim.  (Cf. Counts I & II, Complaint [Doc. No. 1-1].)   In any event, the Minnesota Supreme Court has determined that strict liability and negligent failure to warn claims are analyzed under the same standard.  Johnson v. Zimmer, 02-CV-1328 (JRT/FLN), 2004 WL 742038, *9, n.8 (D. Minn. Mar. 31, 2004) (citing Bilotta v. Kelley Co., 346 N.W.2d 616, 622 (Minn. 1984)).  A plaintiff must establish the following elements of a failure to warn claim under Minnesota law: "(1) the defendants had reason to know of the dangers of using the product; (2) the warnings fell short of those reasonably required, breaching the duty of care; and (3) the lack of an adequate warning caused the plaintiff's injuries." Tuttle v. Lorillard Tobacco Co., 377 F.3d 917, 924 (8th Cir.2004) (citing Erickson v. Am. Honda Motor Co., 455 N.W.2d 74, 77–78 (Minn. Ct. App.1990) (quotations omitted)).  Plaintiff alleges that

> Sunbeam knew or should have known of the potential risk of injury and damage associated with the manufacture, design and/or distribution of its heating pad as provided, and had a duty to warn consumers of the same.  Its failure to do so in this case is the cause of the fire and the damages claimed herein.

(Compl. ¶ 18 [Doc. No. 1-1].)

Under Minnesota law, a manufacturer has a duty to warn the users of its products of all dangers that are associated with those products of which it has actual or constructive knowledge. Gryc v. Dayton–Hudson Corp., 297 N.W.2d 727, 739 (Minn. 1980); Harmon Contract Glazing, Inc. v. Libby–Owens–Ford Co., 493 N.W.2d 146, 151 (Minn. Ct. App. 1992). "Failure to provide such warnings will render the product unreasonably dangerous and will subject the manufacturer to liability for damages under strict liability in tort." Gryc, 2 97 N.W.2d at 739 (quotation omitted). The question of whether a duty to warn exists is a question of law for the Court.  Harmon, 493 N.W.2d at 151.  The adequacy of a warning is typically a question of fact

for the jury.  Balder v. Haley, 399 N.W.2d 77, 81 (Minn. 1987).

Where an adequate warning could not have prevented a plaintiff's injuries, the manufacturer's failure to warn is not the cause of the injury.  Johnson, 2004 WL 742038 at *9 (citing Balder, 399 N.W.2d at 81)).    If there are warnings on the product, Courts consider whether the plaintiff or the injured party has read the applicable warnings.  "In a failure-to-warn case, when a warning label is affixed to the product, '[a]bsent a reading of the warning, there is no causal link between the alleged defect and the injury.'" Yennie v. Dickey Consumer Prods., Inc., No. C1-00-89, 2000 WL 1052175, *2 (Minn. Ct. App. Aug. 1, 2000.))

Sunbeam argues that it provided 14 warnings as part of the instructions for use for the heating pad (Instructions for Use, Appendix B to Blanchard Report [Doc. No. 41-1 at 34]), and provided 13 warnings printed directly on to the cover of the heating pad.  (Photo of Heating Pad Cover and Heating Pad Warnings, Appendices C & D to Blanchard Report [Doc. No. 41-1 at 39 & 41].)   The warnings on the heating pad and its cover include the following: "DO NOT USE WHILE SLEEPING;" "THIS PAD IS NOT TO BE USED ON AN INVALID, A SLEEPING OR UNCONSCIOUS PERSON, A PERSON WITH POOR BLOOD CIRCULATION, A PARALYZED PERSON OR A PERSON WITH DIABETES;" "PLACE PAD ON TOP OF AND NOT UNDER THE PART OF THE BODY NEEDING HEAT," "UNPLUG WHEN NOT IN USE, NEVER USE PINS OR OTHER METALLIC MEANS TO FASTEN THIS PAD IN PLACE."   (Id.) (emphasis added).

 Plaintiff has not provided evidence that the heating pad users, the Horejsis, read the accompanying warnings.  Mrs. Horejsi testified that her husband did not read the instructions or information that came with the heating pad and she cannot remember if she did.  (Horejsi Dep. at 55, Ex. 1 to Barron Aff. [Doc. No. 30-1].)   Whether she read the warnings or not, Plaintiff has

not shown that the Horejsis would have acted differently had they known of the risk, even if provided with different or additional warnings.  Rather, the evidence shows that even if the Horejsis had read the warnings, they ignored many of them.  For instance, Mrs. Horejsi testified that the heating pad was used to warm her husband's feet, due to his poor circulation (id. at 17), although the product warnings indicate that it is not be used by someone with poor circulation.  At her deposition, she testified that she did not recall any such warning.  (Id. at 102.)   She also testified that the heating pad was plugged in at the time of the fire, but not turned on (id. at 17-18), although the product warnings indicate that it should be unplugged when not in use.  She also testified that she had no recollection of any such warning regarding unplugging the device.  (Id. at 102.)  Mrs. Horejsi taped the heating pad to the mattress pad so that her husband could place his feet on top of it (id. at 56-57), although the product warnings indicate that the pad is to be placed on top of the body, rather than underneath it.   Mrs. Horejsi testified that she had no recollection of such a warning regarding placement of the heating pad on the body  (Id. at 102.)  Had she been aware of these warnings, Mrs. Horejsi testified that she did not know whether she would have let her husband use the heating pad in the manner in which he used it.  Rather, she thought she was using it safely and in the only manner that worked for her husband.  (Id. at 103-04.)   In addition to this testimony, Plaintiff's experts do not offer an opinion regarding the adequacy of the warnings at issue or whether a different warning would have prevented Plaintiff's damages.

In Yennie, the Minnesota Court of Appeals found that the plaintiff failed to show that her deceased husband had read the warning labels on the over-the-counter drug in question.  2000 WL 1052175 at *2.  Even if he had, the court found that he disregarded them.   Therefore, the trial court determined, and was affirmed on appeal, that the evidence was insufficient to

demonstrate a causal connection between the allegedly inadequate warnings and the decedent's death.  Id.   Moreover, in Quist, while this Court found that expert testimony was not needed as to the sufficiency of Sunbeam's warnings, it also held that Sunbeam did not owe a post-sale duty to warn about reports of its heating pads causing fires.  Quist, 2010 WL 1665254 at *5.  Under Minnesota law, a continuing duty to warn of dangers associated with using a product arises only in "special cases."  Hodder v. Goodyear Tire & Rubber Co., 426 N.W.2d 826, 833 (Minn. 1988).  This Court found it unreasonable in Quist to expect a manufacturer of heating pads to "adequately trace the owners of their products, who often purchase them anonymously, without registration, from pharmacies and discount stores." Quist, 2010 WL 1665254 at *5.

The Court finds that Plaintiff's evidence on its failure to warn theory of liability is insufficient to withstand summary judgment.   For these reasons, summary judgment is granted in part as to Plaintiff's failure to warn claim.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.   Defendant's Motion to Exclude Expert Testimony and Opinions of Ronald C. Rahman [Doc. No. 23] is **DENIED**;

2.   Defendant's Motion to Exclude Expert Testimony and Opinions of Paul W. Hansen [Doc. No. 27] is **DENIED**;

3.    Defendant's Motion for Summary Judgment [Doc. No. 33] is **DENIED in part, and GRANTED in part**, consistent with this Order;

4.   Plaintiff's claims for breach of express and implied warranty (Count III) are **DISMISSED WITH PREJUDICE**; and

5.   Plaintiff's claim for failure to warn (found in Count II) is **DISMISSED WITH PREJUDICE.**

Dated: January 17, 2012

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge
